Good morning, Your Honors. May it please the Court, I'm Dana Duncan. I represent the plaintiff's office. During a more than two year period, Mr. Voigt received medical treatment from an indigency clinic, a free clinic provided in La Crosse County, Wisconsin, and from La Crosse County Social Services. There are two issues raised in this case. The first is the ALJ's termination of the weight given to a non-acceptable medical source, and the second is the ALJ's credibility determination. In this particular case, the primary treating practitioner was a nurse practitioner from the Department of Social Services for the County of La Crosse, Ms. Day. In this particular situation, indigent patients, especially those from mental health in central Wisconsin and western Wisconsin, due to declining numbers of psychiatrists and psychologists, are using nurse practitioners more. SSR06-3P gives guidance. This is supposed to have been a ruling that was established by Social Security to identify and to clarify longstanding agency policy. The problem is that this ruling has been subject to a variety of interpretations and the courts have done very little to clarify. A search of Westlaw shows that there's only seven cases among the circuits addressing this particular ruling, only six of those published. This court did address it in Pierce v. Colvin, but that was only because the plaintiff appellant in Pierce alleged that the treating practitioner should be given controlling weight. That's not the allegation in this particular case. In this particular case, the ALJ started out by saying that this person gave three reasons for reducing the weight and not giving any consideration to Ms. Day's assessment. First, he starts out by saying she's a non-acceptable medical source. The ruling itself clarifies that Social Security has long established a pecking order. As you may be aware, treating doctors first, then examining doctors next, then non-examining, non-treating doctors. That latter level is about where a nurse practitioner, a chiropractor, or anybody like that goes in. The ruling itself specifically indicates that at times- Wasn't she the treating practitioner, though? It is, but that's a medical source. The ruling does specifically indicate that there are times where someone like Ms. Day may be entitled to more weight than a treating source. They tell you then to apply the checklist factors that this Court has long opposed on treating sources and examining physicians. That should have been done in this particular case and was not. There are going to be times, for instance, you may have an MD who is a general practitioner and has no background in psychology versus Ms. Day who has special training in that area. She may be entitled to more weight because of that. Under Wisconsin law, does she have authority to write prescriptions for scheduled controlled substances? Yes, she does. In fact- Can she see patients who don't ultimately see an MD? Correct. Most of the agencies now, because of that, keep one or two of them in the offices and patients, as they call in and need change in prescriptions or whatever, they are regularly being referred to nurse practitioners as opposed to the psychiatrists who are stuck or limited more to a certain patient or clientele. In this particular case, my biggest part of the argument is the fact that the judge had to point out that this is a non-medical source immediately leads to believe that he's automatically given this individual less weight than anybody else simply because of her circumstances. That's not the way the ruling is established. It just establishes where she should fit within the pecking order and ultimately the application of the specific checklist factors. Then he says that I give it less weight because she only saw him on a few occasions. Well, it was eight, plus she had the treating and examining records and reports from the entire county social services that are disposable. Second, her opinions are inconsistent with the treatment record, but then the ALJ doesn't do a very good job at all of outlining what was inconsistent. The government has established that the GAF scores were inconsistent. Well, there's a reason why when the DSM-5 was established GAF scores were no longer included because there's a very wide range of GAF scores associated and they're very subjective. You just can't do that. In this particular case, if the judge didn't feel Ms. Day was right, he had the opportunity to call his own expert, which he did not do. He could have sent her out for a consultative exam, which he did not do. He could have done a whole host of things. He could have even sent clarifying interrogatories to Ms. Day and asked for her to restate her opinion or to clarify her opinion in any regard. He didn't. Now, the reason I'm focusing on this is because according to the vocational testimony, when you look at her opinion and you prepare that as a hypothetical question, the vocational expert testified that this would result in there being no jobs. And so that's really where the case hinges. Yes, the credibility is an important factor and something that should be considered, but this case really is an important aspect and probably the key portion of this case. Given also the very limited nature of interpretation that the courts have given this, I think some directive is needed from this court to the administration as to how this is to be applied. This is not going to be the first and only time this situation arises. As we have more and more managed health care with various policies, procedures and programs implemented, we're going to see more nurse practitioners, more physician's assistants providing care, especially to those who are such like Mr. Voigt, indigent. This is an individual who basically existed within a certain realm and would only occasionally go to medical facilities when he had the opportunity. Just touching briefly on the issue of the... statement that she made on either October 19th or October 29th, the truth is I think Kevin is a gentleman who has a long-term issue with an inability and failure to thrive in the community, probably secondary to a mood disorder as well as some features of his personality and certain substance abuse. And then she proceeds to indicate that the substance abuse was not a key or primary factor. So that in and of itself should have been addressed as well by the judge because that particular portion is significant. I guess I'll reserve the remainder of my time for rebuttal. Thank you, Mr. Duncan. May it please the court. David Levitt here on behalf of the Commissioner. The ALJ made reasonable findings on the two issues raised by Mr. Voigt in his briefs, namely... Why did he say that Voigt should have gotten injections for his pain? I believe what the Commissioner was getting at was that the treatment offered was conservative. Although Mr. Voigt now says that he was suffering from disabling pain, no one recommended injections or anything more than exercise and lifestyle changes. Well, but the administrative law judge seemed to think that if you don't ask for injections you don't have serious pain. Are injections a conventional way of treating pain? Injections of what? I believe what the ALJ was getting at is he says instead of intensive treatment like injections, the claimant's treater provided, recommended stretching, increased activity, weight loss, and alternating positions. So he's not saying what Mr. Voigt requested. He's saying what the treaters stated. But he infers from the fact that injections or some other radical pain treatment wasn't prescribed that the pain couldn't have been that bad. That's the implication. Isn't it? Isn't that the implication? Yes. What does he know about how you're supposed to treat pain? Well, I think probably the ALJ has seen a number of cases. So what is he, a doctor now? He can tell you, well, yeah, your problem is you're not getting injections. Well, this was only one of the factors cited by the ALJ. Well, I know, but the question is whether it was proper. It doesn't sound proper for administrative law judges to offer their own medical opinions. Well, I don't think this is a medical opinion. This Court has... Well, I don't understand you. He says you don't have injections or some other kind of radical treatment means you don't have serious pain. What's the basis of that? I believe what he's saying is... I don't think it's even true. I'm sorry, Your Honor? What's the medical basis for that? Okay. I believe he's saying that injections could have... Well, what does he know about injections? Injections are painful and maybe they're inefficacious. I don't know. He doesn't know. He doesn't have an MD. He's not even a nurse practitioner, right? That's correct. He's not a nurse practitioner, too, as far as I know. There is the danger of administrative law judges who, having heard a zillion disability cases, decide they know as much as a doctor. We've criticized that in the past. Yes, Your Honor, you have. Let me ask you another question. Where did the vocational expert get the estimate of 23,000 jobs in Wisconsin that Voight can perform? Well, first, Mr. Voight has not challenged that issue, so I believe it's waived. But to answer your question... I'm just curious. Where did these numbers come from? We see them in every case. I'm not certain of exactly where he got them from, but he said that his opinion was consistent with the Dictionary of Occupational Titles. No, because the Dictionary of Occupational Titles does not break down occupations into fine categories. They're very gross categories. No. Now, is the notion that Voight can do anything, any light work? I believe the RFC was for sedentary here. Pardon? I believe the RFC limitation was for sedentary work with other limitations. So he could do any sedentary work? Well, sedentary work within the mental limitations identified by the ALJ. Yes, but the Dictionary of Occupational Titles doesn't have categories like sedentary work for people who have mental problems. Right, that would have to... So where does he get the 23,000? That would have to come from his expertise as a vocational expert. What's his expertise? It's a statistical matter. You don't have expertise about how many jobs there are in fine categories in Wisconsin. Well, presumably he used some sort of source for vocational... Yeah, well, there isn't a source, so you ought to be aware of that. We have been criticizing this in recent opinions, that there does not appear to be any empirical basis for these figures that the vocational experts throw around. Getting back to the ALJ's credibility analysis, one factor the ALJ noted, for example, was Mr. Voight's computer activities. Those cut against his allegations of being unable to concentrate or being unable to sit for long periods of time. Another issue that the ALJ brought up... Now wait, what is this about playing with a computer shows that you're what? Well, he was able to do online research, which would show some ability to concentrate beyond... You say it shows he... Some ability to concentrate beyond having no ability to concentrate, which is what he alleged. And also... What was this online research? This is Googling something? He was researching his own medications. There are also records that he would spend hours on the computer. So the ability to persist in a task like that would suggest that he has greater mental abilities than he alleged. He also sat for long periods at the computer, which would suggest that he has greater sitting abilities than he alleged as well. Another factor is that Mr. Voight stated that he was unable to find a job due to his past history, and that suggests that Mr. Voight was prevented from working due to something other than his mental impairments, which would also make him not disabled. The LJ also noted that Mr. Voight overall had a low... Had very extremely low earnings and catchy work history, which would suggest that perhaps he was unemployed for reasons other than his alleged mental impairments. The LJ also noted that Mr. Voight improved with medication, which would suggest that his condition was amenable to treatment. So in light of all these factors, even if the court wants to find that the LJ's reference to the claimant having conservative treatment and not seeking injections was not proper or not appropriate, in totality there are enough factors to support the ALJ's credibility. Well, what weight did the ALJ give to Day, the nurse practitioner? He gave her little weight, Your Honor. Gave her what? Very little weight, Your Honor. Why? Well, the LJ noted a few factors, but I think the primary factor that he noted was that Ms. Day was regularly assessing global assessment of functioning scores between 55 and 70. The LJ specifically notes scores between 65 and 70. Those indicate mild symptoms. But I thought the GAF had been discredited. I don't believe it's discredited. I believe that it's not included under the DSM-5, which was not in place at the time of this decision. Well, but if it... But it has certainly been downgraded, hasn't it? My understanding is that there is a movement now within psychology to no longer use those type of ratings. How has that been reflected by the Social Security Administration? Do they still cling to the GAF or are they phasing it out or what? Give me it last, Wade. I'm not sure of that exactly. I believe that it's considered if a physician or a, in this case, a nurse were to reference it, that would be something legitimate to consider when looking at the consistency of the overall opinion. If Ms. Day is, in one hand, talking in her treatment notes saying that Mr. Voight had mild limitations and then giving extreme limitations in the submission to the agency, I think that that is something that is reasonable for the ALJ to look at. Well, if the nurse practitioner initially indicated a 50, then a 55, which is not just mild, that's pretty severe, right? Well, 55 is moderate, but by the end of the period where she was treating him, he had raised to a 65 or 70, which is mild. I believe my time is up. Okay, well, thank you very much, Mr. Logan. Mr. Duncan? In reference to the last portion with the GAF scores, even, it depends also in the GAF score, a 55 being moderate depends on what part is moderate. This court's had a lot of case law recently about concentration, persistence, and pace, and moderate limitations have to be dealt with in the hypothetical question. So if, in this particular case, the GAF score was 55 and said moderate in persistence and pace, that's going to have a bigger impact on the ability to work than any other aspect. As far as the credibility, you also have to take into account that the GAF scores are going to change because individuals, by the court's interpretation, have good days and bad days. It makes sense on a particular day that Mr. Voigt will be going to the doctor when he is mentally capable of getting his transportation and his ability to get there organized. There were dates that he didn't show up. I would assume that those were dates that he had less mental ability to do so. As far as some of the other points, the issue of the disabling pain and the issue of the injections, he was going to a free clinic. As the court may be aware from the facts of this case, it took him almost two years to get funding to have a colonoscopy, despite the fact that he was claiming to have internal bleeding or was having bloody stools. I don't know where the ALJ assumed that he was going to automatically be able to get steroid injections and do so on a competent basis. I mean, this stuff is not just available. Let alone talking about conservative treatment when a free clinic does not have an MRI machine to do an evaluation of internal pain, does not have specialists who are readily available. This particular free clinic was offered or established by Gundersen Lutheran and Mayo and La Crosse so that they didn't have to pay for it out of their normal funding. My time has expired. If there are no questions, thank you very much, Your Honor. Thank you, Mr. Gundersen and Mr. Levin.